**STATE, Plaintiff, v. SMITH, Defendant.**

Toledo Municipal Court, Lucas County.

No. 572128. Decided September 10, 1952.

Louis R. Young, Toledo, for State of Ohio.
Paxton & Seasongood, Cincinnati, Marshall, Melhorn, Bloch & Belt, Toledo, for defendant.

## OPINION

By WILEY, J.

In this case an affidavit was filed by a representative of the "State Department of Film Censorship" charging the defendant as the owner of the Westwood Theatre in Toledo, Ohio, with publicly exhibiting a motion picture, to wit: a news reel entitled "The American News Reel," without first submitting the same to the Department of Education for its passage or approval and without the same having been approved or passed by said department. The defendant entered a written plea of not guilty, raising therein constitutional questions under the constitutions of the state of Ohio and the United States. The defendant waived a trial by jury.

It was stipulated by and between the state of Ohio and the defendant that said news reel was publicly shown in the Westwood Theatre by the defendant, the owner of said theatre, on the 17th day of July, 1952, without its having been submitted to, or passed or approved by, the Department of Edu-

cation of the state of Ohio. It was further stipulated that the Department of Education, state of Ohio, Division of Film Censorship, had certain gross receipts derived from censorship of films which were greatly in excess of the actual cost of operation. Objection was made to the admission in evidence of the figures submitted on the ground that they were irrelevant and the court overruled the objection and the statements contained in the written stipulation are admitted in evidence.

The film in question was viewed by the court and admitted in evidence. The film consisted of:

1. Convention High Lights,
2. New Army Dirigible,
3. Headlines in the News, Slum Clearance—Virginia, United States Fleet—British Harbor,
4. Sports Copy—Olympics—Kayaks—England.

Said film was accompanied by a running narrative on the sound track.

The testimony of Walter Ament, vice-president and general manager of Warner Pathe News, Inc., was taken on behalf of defendant. The witness described the method of gathering, printing and editing and distributing newsreel films. He testified that sixty-two (62) prints of any given news film were shown in Ohio each week. He further testified that the average gross revenue or income derived from each print amounted to approximately $21.00 and that the cost of censoring each print amounted to $3.00; that all newsreels consisted of less than 1000 linear feet of film.

The statutes of the state of Ohio, §154-47 to 154-47i GC, cover the "censorship of films." These statutes provide in part that the Department of Education shall examine and censor all motion picture films to be publicly exhibited in the state of Ohio; that such films shall be submitted to the department and passed and approved by it **before** they shall be delivered to the exhibitor for exhibition; that the department shall charge a fee of $3.00 for each reel of film to be censored. * * *

**Sec. 154-47b GC** provides in part as follows: "Only such films as are in the judgment and discretion of the department of education of a moral, educational or amusing and harmless character shall be passed and approved by such department. * * * The department of education shall be authorized to recall any film for recensoring or to revoke any certificate permitting the exhibition of any film in the state of Ohio, whenever in the judgment of the department of education the public welfare requires it. * * *"

Sec. 154-47d GC provides, "No films may be publicly shown or exhibited within the state of Ohio unless they have been passed and approved by the department of education or the censor congress and stamped and numbered by the department of education, or censor congress, as provided herein."

Sec. 154-47e and §154-47f GC are the penalty sections.

Sec. 154-47h GC permits a person who is dissatisfied with any order of the Department of Education to commence an action in the Supreme Court of Ohio for relief against such order.

The defendant has attacked the constitutionality of the statutes involved on three main grounds:

1. It violates the guarantee of free speech and free press as contained in the First Amendment and the Fourteenth Amendment of the Constitution of the United States and in Article I, Section 2, of the Constitution of Ohio.

2. The taxation of moving picture films in a manner other than other property is taxed violates the provisions of both the Ohio and Federal Constitutions.

3. The licensing system adopted for motion picture films contains a vagueness of the criteria on which the administrative officials are to act, particularly as applied to news reels.

Counsel for the state of Ohio contend that the constitutional protections of the United States and the state of Ohio do not require an absolute freedom to exhibit every motion picture of every kind, at all times, and all places; that news reels and motion pictures by their nature present different problems as to censorship than do newspapers, magazines and periodicals and that the license fee does not constitute discrimination nor is it confiscatory. It is also contended that no news reel had been rejected, with one minor exception, by the Division of Film Censorship in the past fifteen years.

We shall first consider the contention of defendant that the Ohio statute is an unconstitutional abridgment of free speech and free press. In Burstyn v. Wilson, 343 U. S., 495 (1952), the Supreme Court of the United States definitely stated that the basic principles of freedom of speech and press do apply to motion pictures, even though their production, distribution and exhibition is a large-scale business, conducted for profit. The court did limit its actual decision to holding that the guaranty of free speech and press prevents a state from banning a film on the basis of a censor's conclusion that it is "sacrilegious"; furthermore, the court found it unneces-

sary to **decide** whether a state may censor motion pictures under a clearly drawn statute.

Let us consider some of the reasoning in the Burstyn case. In this case the court referred specifically to a previous case involving the same Ohio statutes decided by the court in 1915. In the 1915 decision the court held that the exhibition of moving pictures was a business, pure and simple, not to be regarded as part of the press of the country. In the recent Supreme Court decision it is stated that:

"In a series of decisions, beginning with Gitlow v. New York, 268 U. S., 652, this court held that the liberty of speech and of the press which the First Amendment guarantees against abridgment by the Federal Government, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action."

"The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain, as well as to inform. We conclude that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments."

The court went on to state that it did not follow that motion pictures were necessarily subject to the precise rules governing any other particular method of expression.

"Each method tends to present its own peculiar problems but the basic principles of freedom of speech and the press do not vary. These principles, as they have frequently been enunciated by this court, make freedom of expression the rule. There is no justification in this case for making an exception to that rule."

Some of the cases previously decided by the Supreme Court of the United States having a bearing on our present question are as follows: Near v. Minnesota, 283 U. S. 697 (1931). In this case the court held unconstitutional a Minnesota statute which provided for the abatement as a public nuisance of the business of publishing, circulating, possessing a malicious, scandalous and defamatory newspaper, magazine or other periodical. In this case the court also stated that liberty of speech and of the press is not an absolute right and the state may punish its abuse. The court also said that the immunity of the press from previous restraints was not absolutely unlimited but that any limitations to be recognized were only in exceptional cases, such as publications in times of war which would be a hindrance to national effort, or obscene publications, or publications inciting to acts of violence and overthrow by force of orderly government. The court further added that liberty of the press has meant prin-

cipally, although not exclusively, immunity from previous restraints or censorship.

Grosjean v. American Press, 297 U. S., 233 (1935). In this case it was held that a state statute imposing a license based on gross receipts for the privilege of publishing advertising * * * abridges freedom of the press and is, therefore, unconstitutional.

Lovell v. Griffin, 303 U. S., 444 (March 28, 1938). A municipal ordinance forbidding distribution of pamphlets without first securing a permit is invalid as a restraint on freedom of press. Liberty of circulating is as essential as the liberty of publishing. In this case the court particularly emphasized the fact that the struggle for the freedom of the press was historically primarily directed against the power of the licensor.

Schneider v. State, 308 U. S., 147 (November 22, 1939). A municipal ordinance forbidding the handing of handbills to persons on a crowded street to prevent littering of the street was invalid. The court further held that a city could not require a permit for the distribution of literature when it was left to a police officer to determine as a censor what literature could be distributed from house to house and who could distribute it.

Winters v. New York, 333 U. S., 507 (1948). The constitutional guaranty of freedom of speech and press does not preclude prohibition of what is lewd, indecent, obscene or profane. A state statute making it an offense to print, publish or distribute, or to possess with intent to distribute, any printed matter principally made up of criminal news, police reports or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime, construed by the state courts as prohibiting such massing of accounts of deeds of bloodshed and lust as to incite to crimes against the person, does not define the prohibited acts in such a way as to exclude those which are a legitimate exercise of the constitutional freedom of the press and therefore infringes such constitutional right. An enactment enlarging a prohibition of acts deemed injurious to public morals is within the power of a state legislature if it does not transgress boundaries fixed by the Constitution for freedom of expression.

Gelling v. Texas, 343 U. S., 960 (June 2, 1952). This case was decided by the Supreme Court without a lengthy opinion but it did refer directly to the case of Burstyn v. Wilson, previously referred to herein. Mr. Justice Frankfurter, concurring in the decision of the court said: "The appellant here was convicted under an ordinance of the city of Marshall, Texas, for exhibiting a picture after being denied a license by

the local Board of Censors, and the conviction was affirmed by the Court of Criminal Appeals of Texas. The ordinance authorizes a local Board of Censors to deny a license for the showing of a motion picture, which the Board is 'of the opinion' is 'of such character as to be prejudicial to the best interests of the people of said city,' and makes the showing of a picture without a license a misdemeanor. This ordinance offends the due process clause of the Fourteenth Amendment on the score of indefiniteness. See my concurring opinion in Joseph Burstyn, Inc., v. Wilson."

As stated in the Burstyn case, it does not follow that the constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places, but nothing was presented to this court to warrant making an exception to the prevailing rule of "freedom of speech and press." As the testimony of Walter Ament stands uncontradicted and, moreover, is corroborated by the daily experiences of anyone attending moving picture theatres, news reels are an established method of communication of news. No controlling distinction can be made between "news reels" and "newspapers"; consequently, the contention of the defendant that the Ohio statute is unconstitutional as being in conflict with the Constitution of the United States and the state of Ohio is well taken.

(1) Newsreels are entitled to the same protection from "prior restraint" as newspapers and other publications have historically been entitled to receive. The prior restraint in the Ohio statute consists in requiring (A) That the film must be submitted at all for inspection and censoring; (B) A substantial fee is required.

A. Forty years ago, news reels were not a part of the film industry as we know them to be today. Whatever the high purpose of the legislature in enacting the censorship statute originally, or in the reenactment in 1935, its character is such that in the language of Mr. Chief Justice Hughes "it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish 'without a license what formerly could be published only with one.'" Mr. Justice Holmes said that the main purpose of the Constitutional provisions (First and Fourteenth Amendments) was "to prevent all such previous restraints upon publications as had been practiced by other governments."

B. The fee of $3.00 charged by the department for censorship of each news reel is in the nature of a tax. **Sec. 154-47a GC** provides:

"Fifty per cent of all moneys received from the motion picture license fees collected under the provisions of §154-47 **GC**, in excess of such amount as shall be necessary to pay the operating expenses, including salaries, of the division of film censorship shall be paid into a fund to be used by the superintendent of public instruction for disseminating information relative to the history, scenic beauties, natural resources, and industries of Ohio through the office of the director of visual education of the division of public instruction, department of education, and for the creation, maintenance, administration and regulation of a suitable collection of visual aids for loan to the educational institutions of Ohio. The total sum so set aside annually from the fees collected under §154-47 **GC** are hereby and hereafter appropriated to the controlling board for the use of the department of education. Such funds shall be expended only upon the authority of vouchers approved by the superintendent of public instruction and no expenditure from such funds may be made except for the purposes enumerated in this section."

The name by which the exaction is referred to does not necessarily determine whether it is a mere inspection fee or a tax. **Baker v. Cincinnati, 11 Oh St, 534 (1860).** So, while the charge is referred to in §154-47 **GC** as a fee, and in §154-47a **GC** as "motion picture license fees," these are definitely stated to be in excess of the necessary payments for censoring, §154-47a **GC**. This excess is, therefore, not a charge for inspecting for licensing but is an excise tax, even though not so designated in the statutes. **Prudential Coop. Realty Co. v. City of Youngstown, 118 Oh St, 204, 214 (1928); Mays v. Cincinnati, 1 Oh St, 268 (1852); State v. Hipp, 38 Oh St, 199 (1882); Saviers v. Smith, 101 Oh St, 132 (1920).**

It is, therefore, apparent from the statute itself and the decided cases that this is not merely a license fee to cover the cost of making the inspection, but is a tax imposed on motion pictures. Where the same news is being shown by various prints in different parts of the state of Ohio, the tax amounts to many times $3.00 for one thousand linear feet for each inspection.

The proof is convincing from the figures taken from the auditor's reports of the state of Ohio.

For instance, the records of the Office of the Department of Auditor of State of Ohio show that the collections by the

Department of Education, Division of Film Censorship, for the fiscal year ended June 30, 1952, were as follows:

| | |
|---|---|
| Censorship fees | $294,490.50 |
| Substitute leaders | 624.00 |
| Total | $295,114.50 |

The operation of the Division cost $53,431.16. There was, therefore, an excess of collections over expenditures of $241,-683.34.

For the calendar years 1942 through 1948 the collections, expenditures for operations and excess were as shown by the following table:

| Year | Collections | Operating Costs | Excess |
|---|---|---|---|
| 1942 | $188,608.45 | $21,450.00 | $167,158.45 |
| 1943 | 172,995.90 | 22,220.00 | 150,775.90 |
| 1944 | 209,361.80 | 21,762.62 | 187,599.18 |
| 1945 | 218,417.75 | 26,840.93 | 191,576.82 |
| 1946 | 239,111.75 | 30,823.45 | 208,288.30 |
| 1947 | 245,301.25 | 42,284.97 | 203,016.28 |
| 1948 | 286,424 00 | 45,767.64 | 240,656.36 |

The total excess of collections over operating costs, January 1, 1942 through June 30, 1952, was $2,229,960.59.

It is our opinion that these charges constitute a tax and as such are a form of prior restraint which violates the constitutional guarantees of freedom of speech and press.

(2) The defendant's second main contention is that the taxation of moving picture films in a manner other than other property is taxed violates the Ohio and Federal Constitutions To the extent that the charges made are a form of prior restraint, we have already adopted the argument of defendant's counsel, as indicated hereinabove.

Furthermore, as applied to news reels, the Ohio Statutes do discriminate against this medium of dissemination of news and do constitute a violation of §§1-2-16 and 19 of Article I of the Ohio Constitution and the Fourteenth Amendment of the Federal Constitution. There is no attempt by Ohio to tax other media of dissemination of information in the same manner such as newspapers, magazines, radio and televisions. As a striking example of this discrimination there was recently shown on the screens in several Ohio theatres the picture of the Robinson-Maxim prize fight by direct television without the intervention of a film. This was not subject to attempted censorship or collection of tax. If the same prize fight had been recorded on film and shown the same day or the next day in the same theatres, then the Division of Film Censorship would have insisted on licensing and collection of

fees. Pictures of the fight appearing in newspapers and magazines in the state of Ohio were not subject to any special tax.

A film can be run in a television studio any place in the country and reproduced in every home in Ohio that has a television set and there is no attempt at censorship or taxation. The charge of $3.00 per film is discriminatory because it singles out one method of disseminating information as against others, and, therefore, violates the due process and equal protection clauses of the federal and state constitutions.

(3) The third ground on which the Ohio statutes are attacked is that the licensing system adopted for motion picture films contains a vagueness of the criteria on which the administrative officials are to act, particularly as applied to news reels.

Sec. 154-47b GC provides "only such films as are in the judgment and discretion of the department of education of a moral, educational or amusing and harmless character shall be passed and approved by such department." Later in the same section there is a provision that censors "shall be authorized to recall any film for recensoring or to revoke any certificate permitting the exhibition of any film in the state of Ohio, whenever in the judgment of the department of education the public welfare requires it."

There is no provision in the statute for notice of proposed recensoring or revoking the certificate, for a hearing on it, for the return of fees already paid or any other limitation on the exercise of the officials' judgment historically associated with due process of law. All they need find is that in their judgment, whether reasonable or unreasonable, "the public welfare requires it."

This is exactly the same kind of a criterion which was struck down as unconstitutional by the Supreme Court in the case of Gelling v. Texas, 343 U. S. 960 (1952), where the ordinance of the city of Marshall authorized a local Board of Censors to refuse a license for the showing of a motion picture, which the board is "of the opinion" is "of such character as to be prejudicial to the best interests of the people of said city." In making the showing of a picture without a license a misdemeanor (see concurring opinion of Mr. Justice Frankfurter) there is little difference between the "best interests of the people," the words used in the Texas case, and "the public welfare," the words used in the Ohio statute.

The United States Supreme Court has held that the power to revoke a license for the exercise of a constitutional right is an unconstitutional restraint on free speech. In Jones v. Opelika, 319 U. S., 103 (1943), the court vacated its judg-

ment taken in the same case (316 U. S., 584) and adopted the reasoning of the dissenting opinions in the earlier cases. At page 600 of 316 U. S., Mr. Chief Justice Stone said in dissenting in the first case:

"The ordinance in the Opelika case should be held invalid on two independent grounds * * * the other is that the requirement of a license for dissemination of ideas, when, as here, the license is revocable at will without cause and in the unrestrained discretion of administration officers, is likewise an unconstitutional restraint on those freedoms."

In the licensing provision there must be a positive finding "in the judgment and discretion of the department of education," that the film is "either of a moral, educational or amusing and harmless character."

A news reel may appear moral to one person and immoral to another. What to one person is educational to another may be propaganda, and as stated in the Winters case, 333 U. S., at page 510, "What is one man's amusement, teaches and other's doctrine." What may appear harmless to one person may appear harmful to another, depending upon the individual's background, education, experience and environment. The criteria, therefore, come down to what the particular reviewing board happens to think about the particular picture. The Ohio censorship statutes do not say, as the criminal statutes do, that only lewd and obscene publications are objectionable; the provision is that the censors must find that the film is positively moral, educational or amusing and harmless.

In the Winters case, 333 U. S., 507 (1948), the syllabus reads:

"Subsection 2 of section 1141 of the New York Penal Law, as construed by the State Court of Appeals to prohibit distribution of a magazine principally made up of news or stories of criminal deeds of bloodshed or lust so massed as to become vehicles for inciting violent and depraved crimes against the person, held so vague and indefinite as to violate the Fourteenth Amendment by prohibiting acts within the protection of the guaranty of free speech and press."

The court said on page 515:

"The standards of certainty in statutes punishing for offenses is higher than in those depending primarily on civil sanction for enforcement. The crime 'must be defined with appropriate definiteness.' Cantwell v. Connecticut, 310 U. S., 296; Pierce v. United States, 314 U. S., 306, 311. There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment."

This case strikes down an enactment that had been part

of the laws of New York for more than sixty years and New York was but one of twenty states having such legislation. (page 520.)

In Hannegan, Postmaster General, v. Esquire, Inc., 327 U. S., 146 (1946), the court was called upon to decide whether the magazine Esquire may be banned from second class mail, under Section 14 of the Classification Act of 1879, which required that a publication to be admitted "must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, art * * *." In that case the court said regarding vagueness of criteria, beginning at page 157:

"It is plain, as we have said, that the favorable second-class rates were granted periodicals meeting the requirements of the Fourth condition, so that the public good might be served through a dissemination of the class of periodicals described. But that is a far cry from assuming that Congress had any idea that each applicant for the second-class rate must convince the Postmaster General that his publication positively contributes to the public good or public welfare. Under our system of government there is an accommodation for the widest varieties of tastes and ideas. What is good literature, what has educational value, what is refined public information, what is good art, varies with individuals as it does from one generation to another. There doubtless would be a contrariety of views concerning Cervantes' Don Quixote, Shakespeare's Venus and Adonis, or Zola's Nana. But a requirement that literature or act conform to some norm prescribed by an official smacks of an ideology foreign to our system. * * * From the multitude of competing offerings the public will pick and choose. What seems to one to be trash may have for others fleeting or even enduring values. But to withdraw the second-class rate from this publication today because its contents seemed to one official not good for the public would sanction withdrawal of the second-class rate tomorrow from another periodical whose social or economic views seemed harmful to another official."

It might also be noted that the Supreme Court considered this point in the 1915 decision involving the Ohio Statutes.. Then the court said in part "the statute by its provisions guards against such variant judgments, and its terms get precision from the sense and experience of men, and become certain and useful guides in reasoning and conduct. The exact specification of the instances of their application would be as impossible as the attempt would be futile. Upon such sense and experience, therefore, the law properly relies."

In 1915, the Supreme Court also stated that:

"We immediately feel that the argument is wrong or strained which extends the guarantees of free opinion and speech to the multitudinous shows which are advertised * * * and which seeks to bring motion pictures and other spectacles into practical and legal similitude to a free press and liberty of opinion."

"The judicial sense supporting the common sense of the country is against the contention."

"It cannot be put out of view that the exhibition of moving pictures is a business pure and simple, originated and conducted for profit, like other spectacles, not to be regarded, nor intended to be regarded by the Ohio Constitution, we think, as a part of the press of the country, or as organs of public opinion."

"* * * **They** (moving pictures) **are capable of evil.** * * * It was this capability and power, and it may be in the experience of them, that induced the State of Ohio, **in addition to prescribing penalties for immoral exhibitions,** * * * to require censorship before exhibition, as it does by the act under review. We cannot regard this as beyond the power of government."

In the Burstyn case the Supreme Court in 1952 specifically overruled its 1915 decision in reference to whether or not motion pictures were to be considered as protected by constitutional guarantees of freedom of speech and press. We believe the 1915 decision in effect is also overruled as to whether or not the words "moral, educational, or amusing and harmless character" are specific enough to be used in a censorship statute. We submit that all words "get their meaning from the sense and experience of men." Certainly, some words have a specific definite meaning "by the sense and experience of men," others have a general meaning "by the sense and experience of men." The Supreme Court in 1915 referred to the words "moral, educational, or amusing and harmless character" as general terms. Now, when we attempt to give them precise meaning "by the sense and experience of men" we can come to only one conclusion, to wit: that these words are still general terms and subject to multitudinous shades of meaning when applied to a specific film.

Our present Supreme Court has indicated in the Burstyn case that even though films are within the constitutional guarantees of "Freedom of The Press," states may **by proper means** license the distribution of film and may—perhaps—provide for some limitation prior to the showing of film. It appears that there is a recognition by the present Supreme Court of the "possibility of evil" in moving pictures as previously ex-

pressed by Justice McKenna in the 1915 decision of the Supreme Court; but there is also a recognition by the present Supreme Court of the evil in permitting pre-censoring, particularly if the pre-censoring statutes are expressed in general rather than in specific terms.

Inasmuch as the Supreme Court has indicated that moving pictures are within the protection of the "freedom of the press" and yet may be subject to limitations not to be imposed on newspapers and other printed publications, any such limitations must be directed against "the possibilities of evil" which are peculiarly inherent in this recently recognized portion of the press.

In this case, the film involved is a news reel. Under the present censorship law of Ohio, this type of film is not distinguished from any other. To subject a news reel to our present censorship is of itself a greater evil than the possibility of evil against which the statute was designed to protect.

We are not unmindful that in the early history of the moving picture industry certain evils may have existed. The fear of the continuation of such evils may have played a part in the origin of censorship statutes. It can also be assumed that the future development of the industry from a 1915 viewpoint could not be reasonably anticipated and that censorship statutes of necessity were drawn in general rather than specific terms. From a 1952 viewpoint, it appears that self-censorship in the industry has removed much of the possibility for evil that may have existed in the earlier years; likewise, the necessity for the use of general terms in censorship statutes to cover unexpected developments is minimized by the actual development pattern of the industry.

It is, therefore, our conclusion that the censorship statutes of Ohio as they now stand, substantially unchanged for forty years, no longer meet the test of constitutionality now required by the Supreme Court decisions, particularly in regard to news reels.

It is hereby decided that the statutes of the State of Ohio on censorship of films, as applied to news reel films, are definitely unconstitutional. The defendant, Martin G. Smith, is therefore found not guilty and is hereby discharged.