PARAMOUNT FILM DISTRIBUTING CORPORATION,
Plaintiff, v. TRACY et, Defendants.

Common Pleas Court, Franklin County.

No. 203518.    Decided February 4, 1960.

*Messrs. Paxton & Seasongood* and *Messrs. Vorys, Sater, Seymour & Pease,* for plaintiff.

*Mr. Mark McElroy,* attorney general, and *Mr. John A. Hoskins,* assistant attorney general, for defendants.

LEACH, J. This case is before the Court on the demurrer of the defendants to the Amended Petition on the basis of the assertion that (1) This action was not brought within the time limited for the commencement of such actions, (2) Several causes of action are improperly joined, and (3) The petition

does not state facts which show a cause' of action against defendants.

The Amended Petition reads as follows:

"Plaintiff alleges:

"1. Plaintiff is a corporation organized and existing under the laws of the State of Delaware, has its principal place of business at Times Square, New York City, New York, and is qualified to do business in the State of Ohio.

"2. Defendants hold or have held offices in the government of the State of Ohio during the times hereinafter mentioned as follows:

"a) Defendant Joseph T. Ferguson is presently the duly elected and qualified Treasurer of the State and was formerly the duly elected and qualified Auditor of State during the years 1937 through 1953.

"b) Defendant James A. Rhodes is presently the duly elected and qualified Auditor of State.

"c) Defendant Roger W. Tracy was formerly the duly elected and qualified Treasurer of State during the years 1951 through 1958.

"d) Defendant Edward E. Holt is presently the duly appointed Superintendent of Public Instruction and as such acts as the Director of Education.

"e) Defendant R. Merle Eyman was the duly appointed Superintendent of Public Instruction and as such acted as the Director of Education during the years 1954 through 1957.

"f) Defendant Clyde Hissong was the duly appointed Superintendent of Public Instruction and as such acted as the Director of Education during the years 1945 through 1954.

"3. Plaintiff was at all times referred to herein and is now engaged in the business of leasing motion picture films to exhibitors throughout the United States which exhibitors in turn exhibit said motion picture films to their customers in theatres, and plaintiff was and is continually engaged in leasing its films in such manner to exhibitors throughout the State of Ohio.

"4. At all times hereinafter mentioned the laws of "Ohio have contained an unconstitutional and unreasonable section of statutes now known as 'Chapter 3305: Censorship' and pre-

viously known as Sections 154-47 and 154-47h, General Code (hereinafter referred to as the 'Censorship Statutes') which Censorship Statutes require that all motion picture films to be publicly exhibited and displayed in the State of Ohio shall be examined and censored by the Ohio Department of Education and that such films shall be submitted to the Department of Education and passed and approved by it before they shall be delivered to the exhibitor for such exhibition. Said Censorship Statutes further provide that the Department of Education shall charge a fee of $3.00 for each reel of film to be censored which does not exceed 1,000 linear feet and $3.00 for each additional 1,000 linear feet or fractional part thereof. Said Censorship Statutes further provide that all moneys so received shall be paid each week into the Ohio State Treasury to the credit of the general revenue fund but all money so received in excess of such amount as is necessary to pay the operating expenses of film censorship shall be paid into a fund to be used by the Superintendent of Public Instruction for various stated purposes and said sum so set aside in such fund shall be expended only upon the authority of vouchers approved by the Superintendent of Public Instruction. Said Censorship Statutes further prohibit the delivery by any motion picture film distributor to any exhibitor or other person for public showing or exhibition in Ohio and prohibit the public showing or exhibition in Ohio by any person, firm or corporation of any motion picture films which have not been submitted for censorship and from which all eliminations ordered by the censor have not been made and said Censorship Statutes provide criminal penalties for any violations thereof.

"5. Said Censorship Statutes and the enforcement thereof are and were in contravention of the First and Fourteenth Amendments to the Constitution of the United States and of Secs. 1, 11, 16 and 19 of Art. I of the Constitution of Ohio.

"6. For many years previous to and through the year 1954 those of defendants who were from time to time holding the offices of Ohio State Superintendent of Public Instruction, Ohio State Treasurer, and Ohio State Auditor as stated in paragraph 2 hereof enforced the said unconstitutional and unreasonable Censorship Statutes against plaintiff under color of their respec-

tive offices by requiring plaintiff to submit its motion picture films to censorship in accordance with the terms thereof and charged and collected from plaintiff a fee of $3.00 for each reel of film censored which did not exceed 1,000 linear feet and $3.00 for each additional 1,000 linear feet or fractional part thereof under threat of enforcement of the above mentioned criminal penalties. Said defendants further threatened the enforcement of said penalties against exhibitors who displayed motion picture films which had not been so submitted for censorship and said exhibitors refused to lease from plaintiff any uncensored film because of such threats.

"7. At the end of the year 1954 those of defendants who were then holding said respective offices ceased to enforce and ceased to threaten to enforce said unconstitutional and unreasonable censorship statutes and ceased to require plaintiff to submit its films for censorship and to pay such fees as aforesaid.

"8. During the years 1952, 1953 and 1954 those of defendants who were then holding said respective offices under color of their respective offices and pursuant to said unconstitutional and unreasonable Censorship Statutes charged and collected from plaintiff the sum of $55,846.50 as fees for censoring its motion picture films under said unconstitutional and unreasonable Censorship Statute.

"9. Plaintiff paid said fees involuntarily and under duress as necessary to do business in Ohio and to avoid the imposition upon it of the criminal penalties provided by said unconstitutional and unreasonable Censorship Statutes which defendants would otherwise have enforced, and to protect its business from loss or destruction which would have necessarily resulted from the refusal of exhibitors to lease plaintiff's films because of the threat of enforcement of said criminal penalties against said exhibitors.

"10. Those of defendants who now hold said offices illegally received said payments and continue to and now do illegally hold or have exercised control over or disbursed said funds under color of their respective offices.

"11. Each defendant is liable to plaintiff for all of said $55,846.50 or for such part thereof as was at any time illegally

collected by him or at his direction or under his authority or was or now is illegally held by him or under his control or was or now is subject to his right to make disbursements thereof under color of any office of the State of Ohio.

"12. Plaintiff has made demand on defendants for repayment of said sums but said demands have been refused.

"WHEREFORE, plaintiff prays for judgment against the several defendants and each of them as their liability shall appear in a total of $55,846.50 for such part thereof as to each defendant as was at any time illegally collected by him or at his direction or under his authority or was or now is illegally held by him or under his control or was or now is subject to his right to make disbursements thereof under color of any office of the State of Ohio with interest and for its costs herein expended."

By way of background it should be noted that on February 23, 1915, the United States Supreme Court in the case of *Mutual Film Corporation* v. *Industrial Commission of Ohio,* 236 U. S., 230, upheld the constitutionality of the Ohio movie censorship laws. On May 26, 1952, in *Burstyn* v. *Wilson,* 343 U. S., 495, that court held invalid as a denial of freedom of speech and of the press that portion of a New York statute which permitted denial of an Exhibitor's license as to films found to be "sacrilegious."

Following the decision in the *Burstyn case,* the Ohio statutes again came under attack in *Superior Films, Inc.* v. *Department of Education et al.,* 159 Ohio St., 315. The constitutionality of such statutes was there upheld.

Upon appeal to the United States Supreme Court, the judgment of the Ohio Supreme Court was reversed, 346 U. S., 587. The per curiam opinion of the Supreme Court merely stated that such judgments were reversed and cited the *Burstyn case,* making no further comment.

The Ohio Supreme Court decision in the Superior Films case was dated April 29, 1953, and the Supreme Court decision January 18, 1954.

Thereafter, on April 26, 1954, Judge Bartlett of this court in *R. K. O. Radio Pictures, Inc.* v. *Department of Education,* Case No. 189,797, refused an order which was sought to enjoin the Department of Education and certain officials of the

State of Ohio from administering these statutes. This judgment was appealed to the Court of Appeals and, while such appeal was pending, the Ohio Supreme Court on December 1, 1954, decided the case of *R. K. O.* v. *Department of Education,* 162 Ohio St., 263. Technically since the opinion was concurred in by less than six members of the Supreme Court, this decision did not and could not declare specifically such statutes to be unconstitutional. The actual and practical effect of the decision, however, was to do just this, the Court concluding that under the pronouncements of the Supreme Court of the United States, any censoring order made by the Department of Education must be held to be unreasonable and unlawful within the meaning of those words as used in the statute.

Subsequent to this decision, on January 5, 1955, the Court of Appeals reversed the decision of Judge Bartlett in case No. 189,797 (Court of Appeals number 5166), and permanently enjoined the administration of the censorship laws as prayed for.

Before proceeding to a more detailed discussion of other aspects of this case, it is important to understand and to keep in mind the exact nature of the relief here sought. Counsel for the defendants assert in their briefs that actually this is a suit against the State of Ohio and as such is unauthorized since Article I, Section 16 of the Ohio Constitution is not self- executing. *Raudabaugh* v. *State,* 96 Ohio St., 513; *Palumbo* v. *Industrial Commission,* 140 Ohio St., 54.

As to this assertion we agree with counsel for the plaintiff. Obviously, of course, this is not an action brought directly against the State. Furthermore, as we read and understand the petition, and as is concede in briefs of counsel for the plaintiff, this is not an action to compel state officials to pay monies from the Treasury of the State of Ohio, but instead is an action against them personally. In other words, any judgment against any of the defendants, insofar as payment is concerned, would be their personal responsibility.

As to this issue, the case of *Ford Motor Company* v. *Department of Treasury of Indiana,* 323 U. S., 459, is not in point, since in that case even though public officials were nominal parties defendant and even though the State of Indiana, itself, was not named as a party defendant, the Indiana law provided that

any recovery would be "out of any funds in the State Treasury." The Ohio law contains no comparable provision and thus illustrates the fact, as heretofore stated, that any judgments obtained in the instant case would be personal obligations of the individual parties defendant. In this connection see also *Great Northern Life Insurance Company* v. *Read,* 322 U. S., 47, and contrast *Scott* v. *Donald,* 165 U. S., 58, and *Atchison, Topeka and Santa Fe Railway Company* v. *O'Connor,* 223 U. S., 280.

By way of further illustrating the proposition that this action seeks personal judgments against the defendants, and does not seek to compel them in their official capacity to pay monies in the hands of the State Treasury to the plaintiff, it should be noted that Sections 154-47 and 154-47a General Code (Sections 3305.01 and 3305.03, Revised Code), through the year 1952 and until October 13, 1953, provided in effect that 50% of the fees collected should be paid each week into the State Treasury to the credit of the General Revenue Fund. The other 50% was paid into a sort of a special fund which fund was appropriated "to the controlling boards" for the use of the Department of Education, such funds to be expended upon the authority of vouchers approved by the Superintendent of Public Instruction. Subsequent to October 13, 1953, all of the fees collected were paid to such special fund, which, however, as previously noted, were appropriated by the General Assembly to the controlling board for the use of the Department of Education. When this language is coupled with the provisions of Sections 22 and 29, Article II, of the Constitution of Ohio, which require a specific authorization by the General Assembly for the withdrawal of funds (See *Grandle* v. *Rhodes,* 169 Ohio St., 77), it is even clearer that this action is and must be an action to require the defendant individually or collectively to pay their own monies to the plaintiff.

With this background, we find that the assertion of counsel for the defendants that, as to certain of the defendants, two judgments are sought, one in his individual capacity and one in his official capacity, and that therefore there is a misjoinder of causes of action, is not well taken. The demurrer, insofar as it asserts a misjoinder of causes of action is overruled.

We turn now to a consideration of whether this action was

brought within the time limited for the commencement of such action. Section 2723.01, Revised Code, as to recovery of "taxes and assessments" provides that no recovery shall be had unless the action is brought within one year after the taxes or assessments are collected.

If we were to follow the reasoning of the Toledo Municipal Court in *State* v. *Smith*, 63 Ohio Law Abs., 452, it might be concluded that the fees in question, even though designated as "a fee" actually would be taxes and thus that any recovery sought would be governed by the provisions of Section 2723.01, Revised Code. We quote from the opinion of the *Smith case* at page 459:

"The name by which the exaction is referred to does not necessarily determine whether it is a mere inspection fee or a tax. *Baker* v. *Cincinnati*, 11 Ohio St., 534 (1860). So, while the charge is referred to in Section 154-47, General Code as a fee, and in Section 154-47a, General Code, as 'motion picture license fees,' these are definitely stated to be in excess of the necessary payments for censoring, Section 154-47a, General Code. This excess is, therefore, not a charge for inspecting for licensing but is an excise tax, even though not so designated in the statutes. *Prudential Coop. Realty Co.* v. *City of Youngstown*, 118 Ohio St., 204, 214 (1928); *Mays* v. *Cincinnati*, 1 Ohio St., 268 (1852); *State* v. *Hipp*, 38 Ohio St., 199 (1882); *Saviers* v. *Smith*, 101 Ohio St., 132 (1920)."

However, the Supreme Court of Ohio in the *Superior Films case*, decided later, held as indicated by the fourth paragraph of the syllabus:

"The fees required by statute for the inspection and censorship of moving picture films to be publicly exhibited within the state, even though such fees exceed to some extent the necessary costs for making the inspection, constitute license fees and not a tax and are, therefore, not discriminatory or unlawful."

While the *Superior Films case* was reversed by the United States Supreme Court, apparently as to the censorship issue, we do not consider that that decision had the effect of reversing the fourth paragraph of the syllabus, although in view of the actual statement of the Supreme Court, it of course is impossible to tell.

We conclude, therefore, as asserted by counsel for the plaintiff, that the provisions of Section 2723.01, Revised Code, have no application herein.

What statute of limitations is therefore applicable? Counsel for defendants assert that if Section 2723.01, Revised Code, is not applicable, in such event this action is barred by pp (D) of Section 2305.09, Revised Code, which provides a four year statute of limitations "for an injury to the rights of the plaintiff not arising on contract nor enumerated in Sections 2305.10 to 2305.12, inclusive, 2305.14 and 1307.08, Revised Code."

Counsel for plaintiff assert that the applicable statute of limitations is the six year period for "an action upon a contract not in writing, expressed or implied" provided in Section 2305.07, Revised Code.

In support the latter contention, counsel for plaintiff rely upon *Mount v. Lakeman,* 21 Ohio St., 643; *People, ex rel. First National Bank v. Schadt,* 237 App. Div., 233, 261 N. Y. S., 849; *Pacific Coal and Lumber Co. v. Pierce County,* 133 Wash., 278, 233 Pac., 953; and *Boston Safe Deposit and Trust Company v. Boyd,* 139 Kansas, 411, 32 Pac. 2d, 218. Counsel for the defendants assert that the factual situation presented herein is distinguishable from the *Mount case* and more analogous to that presented in *State, ex rel. Lien v. House,* 144 Ohio St., 238, wherein the four year statute of limitations was applied to an action against trustees for loss of funds arising from a breach of trust.

The petition herein was filed on December 24, 1958. While it is doubtful if the plaintiff made any payments after December 1, 1954, the date of the decision of the Supreme Court of Ohio in the *R. K. O. case* which, in effect, ended movie censorship in Ohio, the petition makes general reference to payments in 1952, 1953 and 1954.

In our opinion, both the *Mount case* and the *House case* are distinguishable and do not answer the question here involved as to which statute of limitations should be applied. Giving to Section 2305.07, Revised Code, a liberal interpretation and considering that it applies to contracts implied in law as well as implied in fact (quasi contracts) and excepting analogous holdings in the decisions of other states heretofore referred

to, we conclude that Section 2305.07, Revised Code, is applicable *to the extent that this is an action on an implied or quasi contract.*

This leads us to the next and to the fundamental question herein involved. Does the law imply under the factual situation here involved an obligation on the part of the defendants to personally reimburse the plaintiff for the payments herein made? While the answer to this question involves a consideration of whether such payments were made "involuntarily," the answer to this consideration does not necessarily lead to any conclusion that such an obligation is implied in law.

Much discussion has also been had, and many cases cited, relative to the potentially conflicting principles (1) that a ministerial officer may not declare a statute unconstitutional but instead has a legal obligation to carry out the provisions of the same until such has been declared unconstitutional by a judicial body, and (2) that an unconstitutional statute is completely void and accords no protection to public officers who purport to act by virtue of such a void enactment.

From an analysis of the many cases cited to this Court, and others, it would appear that such cases could only be rationalized on the basis of a conclusion that, even though a public officer be not fully *protected* by actions taken under an unconstitutional statute, his actions in this regard do not create personal liability except in those situations where his action per se, and with no protective cloak of immunity by virtue of the unconstitutional statute, would constitute such a common law "wrong" as to give rise to such liability, or where liability would be imposed by a consideration of basic equitable principles.

In an action against William S. Wilson, Treasurer of Clark County (name of plaintiff not given), a Common Pleas Court of Clark County, held in 13 Weekly Law Bulletin, 438, as follows:

"Where an act of the General Assembly, imposing an assessment upon property or a business, has been declared by the Supreme Court of the state as valid and of constitutional obligation, so long as such decision of the court stands in force and unreversed, such act of the legislature and such decision

must be regarded as settled law in relation to the subject matter thereof; and any assessment levied and paid to the proper officer under the provisions of such act, while the decision and judgment of such court stands in force and unreversed, cannot be recovered back in action against the officer receiving or collecting the same, though the same court should subsequently reverse its former decision and hold the act invalid.''

A similar holding made by the Logan County Common Pleas Court in *Hornberger* v. *Case*, 13 Weekly Law Bulletin, 511. We quote from that decision:

''It does not follow as a matter of course, that when and because the legislature shall have enacted a statute, a public officer shall execute it. But his refusal to execute it must be justified, if at all, by judicial decision regularly invoked in his support through the tribunals established for that purpose. But when the highest judicial tribunal in the state has declared a statute valid and constitutional, while such decision remains unreversed, it must, in the very nature of things, be regarded as settled law.

''There is nothing more that can be done. There is no other tribunal to appeal to. The decisions of the supreme court, while in force, are in theory infallible. They are the expressions of sovereign judicial will, to which all subordinate officers are bound to render implicit obedience. After the constitutional validity of a statute has been affirmed by the highest judicial tribunal of the state, it is, doubtless, competent for the same tribunal subsequently to overrule its former decision, and invalidate it; but acts done by a public officer before the decision of reversal, in pursuance of the statute itself, and in pursuance of the decision declaring it valid and constitutional, cannot be said to be illegal. He can only obey and execute the law thus affirmed and validated by supreme judicial determination. Any other principle or rule would simply work confusion and anarchy. Can it be that public officers, charged with the duty of obeying and enforcing the laws, as judicially determined, will become criminals because of such obedience? If the defendant had failed to make the collections about which complaint is made, he would have been guilty of a dereliction of official duty. How, then, can it be said that he did an illegal act when he

made the collection? I have not the means at hand of knowing how much money was collected in Ohio under circumstances such as appear in this case, but the amount is perhaps not far from a million of dollars. That large sum has long since been disbursed as the statute prescribed, and has passed out of the possession and control of the various county treasurers. If they are liable to refund that money at all, they are liable personally. It would be shocking to every sense of right and justice to hold that these officers must now suffer personally for doing the very thing they were compelled to do officially, as was decided and determined by the sovereign judicial authority of the state. While the decision of the supreme court, declaring the statute valid and constitutional was in force and unreversed it was the law, which all were bound to obey; and the fact that the same court subsequently declared the law unconstitutional, cannot affect acts done or rights acquired while the former decision remained undisturbed.''

Counsel for plaintiff assert that such holdings are not and never have been the law of Ohio and that on the contrary, the Ohio Supreme Court has consistently held that a state officer is liable for the re-payment of amounts collected under an illegal or unconstitutional statute, even though he acted entirely in good faith and in reliance upon a previous judicial determination that the statute was valid. In support of this statement, counsel rely on *Loomis* v. *Spencer*, 1 Ohio St., 153, and *Ratterman* v. *American Express Company*, 49 Ohio St., 608.

In the *Loomis case* it is stated at page 158:

''That a treasurer who seizes property to pay a tax assessed, without any color of law for its assessment, or under an unconstitutional law (which is the same as no law), is liable in trespass, seems to have been decided in *McCoy* v. *Chillicothe*, 3 Ohio, 370, and impliedly admitted in *Raguet* v. *Wade*, 4 Ohio, 107, and we have no doubt that such is the law.''

Actually that statement in the *Loomis case* appears to be dicta. Actually the Court held therein that the County Treasurer was not liable for collecting the tax since the illegality of the particular assessment was owing to some error or omission of those charged with the execution of the law prior to the Treasurer being called upon to act. Furthermore, a careful

reading of the Raguet and McCoy cases does not indicate that either of such cases specifically so held. Actually in the *Raguet case* no mention at all was made of this issue and the *McCoy case* involved an action for injunction against levying of an allegedly unconstitutional tax and not the question of personal liability.

Basically the *Ratterman case* involved a consideration of whether the payment of the tax was voluntary or involuntary, the action for recovery being brought under the statute which is now Section 2723.01, Revised Code, et seq. While the *Ratterman case* may be considered as potentially in conflict with the cases cited from 13 Weekly Law Bulletin insofar as an obligation to repay *under statutory law* be concerned, it gives us little or no help on the question of whether there is an implied obligation of law to make personal repayment in the absence of statute.

Plaintiff herein has relied in large measure on *Osborn v. Bank of the United States*, 9 Wheat., 738, and asserts in effect, that the instant case is practically indistinguishable from the *Osborn case*.

That case involved a situation where Osborn as the Auditor of the State of Ohio, employed Harper who, *in violation of a temporary injunction by a Federal Court*, seized $100,000.00 of the Bank of the United States purportedly in obedience to a tax statute of the State of Ohio. Thereafter, some $98,000.00 of this sum was turned over to Curry, State Treasurer, which was held by him intact and ultimately turned over to Sullivan, his successor as treasurer, who also kept this $98,000.00 intact. To the extent that a judgment was ultimately rendered against Sullivan, such consisted of an order directing restitution of the specific sum of $98,000.00 which he was holding. It is true that judgment in the amount of $2,000.00 was also rendered against Osborn and Harper. While this does not appear to have been discussed in the opinion, it would appear from the fact that $100,000.00 had been seized and only $98,000.00 turned over to Curry, that Osborn and Harper had retained the sum of $2000.00, we presume as a fee under the statutes then in force and effect.

The instant case, in our opinion, is distinguishable from the

*Osborn case* in that there is not any sum of money in specie being held in a segregated fund, by virtue of a temporary restraining order or otherwise, as to which direction for repayment can be made. Secondly, there is no allegation herein and obviously the defendants have not personally retained any of the fees either paid to them or passing through their hands or as to which they kept records and any theory of unjust enrichment resulting therefrom would not be applicable. Furthermore, in our opinion, the *Osborn case* is distinguishable in that here the seizure of the money was done with knowledge of a court injunction prohibiting the same, whereas in the instant case the defendants would have every right to rely upon the statutory duty imposed upon them by law, as well as the prior court decisions heretofore referred to.

The case of *Scott* v. *Donald*, 165 U. S., 58, is distinguishable upon two bases. In the first place, the public officer was there considered as a "tort-feasor" and secondly, this was an "intentional, malicious and repeated interference by the defendants with the exercise of personal rights and privileges secured to the plaintiff by the Constitution of the United States, as alleged in the complaint." See page 89.

In *Atchison, Topeka and Santa Fe Railway Co.* v. *O'Connor, supra,* the monies remained in an identifiable trust fund and, as stated at page 287 of the opinion of Mr. Justice Holmes, "upon the filing of a certified copy of the judgment the auditor may draw a warrant for the refunding of the tax and the State Treasurer may pay it." Thus this case is distinguishable in that no personal judgment was granted requiring the public officer to pay such out of his own pocket.

*Poindexter* v. *Greenhow*, 114 U. S., 270, involved an action against a public officer for the recovery of specific personal property, to-wit: one office desk. A United States Supreme Court decision, involving facts much more analogous to those presented herein, is *Brainard* v. *Hubbard*, 12 Wall. 1, 20 Law Edition, 272. We quote from the opinion of Mr. Justice Clifford therein:

"Payment of the amount into the public treasury before the suit was brought, would be a good defense to the action if the right of the plaintiff depended solely upon an implied

promise at common law, as the payment was made in pursuance of the requirement of an act of Congress, and the rule is well settled that the law will not imply a promise by a public officer to pay money in his hands as such officer twice, nor to pay it to a private party in a case where the law requires him to pay it into the public treasury, and he has complied with that requirement. 13 Stat. at L. 236; 13 Stat. at L. 485; *Cary* v. *Curtis*, 3 How., 250. Indebitatus assumpsit is founded upon what the law terms an implied promise on the part of the defendant to pay what in good conscience he is bound to pay to the plaintiff. Where the case shows that it is the duty of the defendant to pay, the law imputes to him a promise to fulfill that obligation. Such a promise to pay, however, will never be implied unless some duty creates such an obligation, nor will the law ever imply a promise to do an act contrary to law or in violation of a public duty. *Curtis* v. *Fiedler*, 2 Black, 478, 17 L. Ed., 276. Collectors of import duties, are required to pay all moneys by them collected into the Treasury of the United States, and where such moneys have been collected and the payment has been made into the Treasury as required by the act of Congress, the law, in the absence of any other statutory regulations upon the subject, would not imply any promise on the part of the collector to pay back the amount to the tax payer, even if it appeared that the assessment was erroneous or illegal, as he could not, in such a case, be under any obligation to pay the money twice, and to have paid it back to the tax payer in the first place would have been contrary to his official duty as prescribed by an act of Congress. * * *''

Since the plaintiff herein is not relying upon any statutory obligation of repayment but upon an asserted implied promise at common law and since there is no allegation that any of the defendants did not pay the money collected to the State Treasury or to the special fund appropriated to the controlling board for the use of the Department of Education and since such money therefore is not available to any of them for the purposes of repayment, certainly the principles of implied contract or quasi contracts, being based principally upon the theory of unjust enrichment, would not imply any promise on the part of the collector, ''to pay the money twice.'' We are

fully in accord with this expression by Mr. Justice Clifford and on such basis we conclude that no cause of action has been stated against the defendants on the theory of quasi contract.

Another United States Supreme Court decision, somewhat analogous to the situation presented herein is *Elliott* v. *Swartwout*, 9 Law Ed., 133. We quote from the opinion of Mr. Justice Thompson, at page 151:

"The case put in the second point is where the collector has received the money in the ordinary and regular course of his duty, and has paid it over into the treasury, and no objection made at the time of payment, or at any time before the money was paid over to the United States. The manner in which the question is here put, presents the case of a purely voluntary payment, without objection or notice not to pay over the money, or any declaration made to the collector of an intention to prosecute him to recover back the money. It is therefore to be considered as a voluntary payment, by mutual mistake of law; and, in such case, no action will lie to recover back the money. The construction of the law is open to both parties, and each presumed to know it. Any instruction from the Treasury Department could not change the law or effect the rights of the plaintiff. He was not bound to take and adopt that construction. He was at liberty to judge for himself, and act accordingly. These instructions from the treasury seem to be thrown into the question for the purpose of showing, beyond all doubt, that the collector acted in good faith. To make the collector answerable, after he had paid over the money, without any intimation having been given that the duty was not legally charged, cannot be sustained upon any sound principles of policy or of law. There can be no hardship in requiring the party to give notice to the collector that he considers that duty claimed illegal, and put him on his guard, by requiring him not to pay over the money. The Collector would then be placed in a situation to claim an indemnity from the government. But if the party is entirely silent, and no intimation of an intention to seek a repayment of the money; there can be no ground upon which the collector can retain the money, or call upon the government to indemnify him against a suit. It is no sufficient answer to this that the party cannot sue the

United States. The case put in the question is one where no suit would lie at all. It is the case of a voluntary payment under a mistake of law, and the money paid over into the treasury; and if any redress is to be had, it must be by application to the favor of the government, and not on the ground of a legal right.''

In connection with the above quotation, it should be noted that the instant petition, while alleging in somewhat general language that the defendants who were then public officials, enforced the censorship statutes ''by requiring plaintiff to submit its motion picture films to censorship'' and ''under threat of enforcement of the above mentioned criminal penalities'' and, while alleging the legal conclusions that said fees were paid ''involuntarily and under duress,'' there is no allegation of any fact that the plaintiff put any of the defendants on their guard by requiring them not to pay over the money. In fact, there was not even any allegation that any protest was made the time of such payment such as to impliedly, if not expressly, notify the defendant to whom payment was actually made, of any intention to sue to recover such monies, so that he at least, would have the opportunity of holding such money in a segregated fund to meet the possibility of required repayment.

In *O'Shields* v. *Caldwell*, 35 S. E. 2d, 184, the Supreme Court of South Carolina held that until an act has been judicially declared unconstitutional, the knowledge of its invalidity will not be imputed to a public officer who has relied upon it in good faith, that ordinarily a public officer charged with the disbursement of public funds is not liable for paying out public money when directed to do so by statute although it may subsequently be determined by the courts that the statute is unconstitutional, and that a public officer is liable for disbursing funds under an unconstitutional act only if the circumstances show that he acted fraudulently or in bad faith.

We see no basic distinction between the matter of holding a public officer not liable for payments from the public treasury made under an unconstitutional statute, but done in good faith, and the collection of monies under an unconstitutional statute which, in accordance with such statute, are paid to the state and

not retained for his personal benefit, no question of good faith being involved.

In *Kleban* v. *Morse*, 247 S. W. 2d, 832, the Supreme Court of Missouri held that where state officials collected use tax on motor vehicles and deposited money in depository of state, such officials were not individually liable for amounts so collected after the statute under which such monies had been collected, was declared unconstitutional. The Court there stated that judgments against defendants as individuals who were innocent of wrong-doings should not be encouraged and that their official duty was to administer the law and not to pass upon its legality.

As heretofore stated, it is the contention of counsel for the plaintiff that plaintiff is entitled to recover "upon an implied or quasi-contract, having its origin in the common law action of assumpsit." While counsel for the plaintiff do not expressly state, we must assume that they are speaking of contracts implied in law and not contracts implied in fact. Contracts implied in fact rest upon the *intention* of the parties. 9 Ohio Jurisprudence, 245. Contracts implied in law or quasi contracts, by way of contrast, are but the adoption of a fiction in pleading—that of a promise where none in fact exists or can on reason be supposed to exist—and while from a pleading standpoint historically an action at common law, such an action is predicated upon equitable considerations. *Columbus Hocking Valley and Toledo Railway Co.* v. *Gaffney*, 65 Ohio St., 104. A quasi contract is a mythical creation of the law adopted for the purpose of enforcing a legal duty by an action in form ex contractu, but in reality in the nature of a bill in equity. 11 Ohio Jurisprudence 2d, 256. *Central National Bank of Cleveland* v. *International Sales Co.*, 87 Ohio App., 207. In *Rice* v. *Wheeling Dollar Savings and Trust Co.*, 155 Ohio St., 391, the third paragraph of the syllabus reads:

"A quasi contract is an obligation imposed by law whereby civil liability arises as to one who has received benefits which he is not justly entitled to retain and for which he may be made to respond in an action in the nature of assumpsit."

Assuming that the individual defendants actually collected or received the monies paid by way of movie censorship fees for the years in question (which assumption except as to those

persons then occupying the offices of superintendent of public instruction and the Treasurer of the State of Ohio, would be rather far-fetched), nevertheless, in our opinion, these defendants have not "received benefits" which they are not justly "entitled to retain" since, in the sense of personal liability, they neither "received" nor did or do they "retain" such benefits.

In our opinion, no cause of action is stated even as to those defendants who did physically receive payment. Furthermore, by the very nature of the duties of the State Auditor, it could hardly be said that that office ever had custody of the money in any event.

We might discuss herein other questions presented such as whether Mr. Holt as the present superintendent of Public Instruction by virtue of the recent constitutional amendment, is truly a successor to his predecessors of the same title and also questions as to what possible basis there would be for personal liability against him in the absence of any law directing or authorizing him to make payments of any unexpended balance, assuming that the particular money as specie could be traced to an existing fund available for such distribution. These, together with the specific question of whether the plaintiff would be barred from recovery in any event by virtue of a "voluntary" payment, need not be discussed. We do, however, point out that in the *Ratterman case*, as to which plaintiff relies on the question of the voluntariness or involuntariness of the payment, that the syllabus required as an element of involuntary payment, not only the elements of avoiding a criminal penalty and avoiding a danger of destruction of business, but also a requirement that the payment be "under protest, and with notice of an intention to bring action to recover back the amount paid." While it is true that since the action was brought under a statute, these requirements were also statutory requirements, nevertheless it would appear logical that they should be common law elements of an "involuntary payment." In this connection Cooley on Taxation (4th ed) Section 1283, states that in order to constitute an involuntary payment, there must be not only some degree of compulsion to which the taxpayer submits, but also a "notification of some

equivalent to reservation of rights." As heretofore noted, the petition herein does not allege any such notification or any facts from which an implication thereof could be made.

Over-riding all other considerations herein, in our opinion is the fact that plaintiff's right to personal recovery against the defendants or any of them, is and must be predicated solely on the theory of quasi contract. As stated in *Moses* v. *Macferlan*, 2 Burr., 1005, cited with approval by Judge Zimmerman at page 398 in his opinion in the case of *Rice* v. *Wheeling Dollar Savings and Trust Company, supra*:

" ' "In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case, is *obliged by the ties of natural justice and equity* to *refund* the money." ' "

From our understanding of "natural justice and equity" we see neither justice nor equity in a principle which would so ignore the basic facts of life as to predicate personal liability upon a public officer who merely and routinely fulfills his statutory obligation under a statute later held to be unconstitutional, especially where this same statute had previously been held by the same Court (but with different personnel) to be constitutional and where it also had been held to be constitutional by the highest court of this state.

The demurrer of the defendants to the amended petition is sustained on the basis that such amended petition does not state facts which show a cause of action against the defendant or any of them. Under the principles which we have here set forth, we doubt if the plaintiff could amend its petition to state a cause of action. However, if within these principles plaintiff feels that such could be done, leave is granted to file such an amended petition within rule. If plaintiff concludes that it cannot be done and chooses not to plead further, in such event final judgment may be entered in favor of the defendants at the costs of the plantiff.

Appropriate entry may be prepared accordingly, reserving exceptions.

## PARAMOUNT FILM DISTRIBUTING CORPORATION, Plaintiff, v. TRACY et, Defendants.

### No. 203518. Decided November 9, 1960.

LEACH, J. In our decision of February 4, 1960, sustaining a demurrer to the Amended Petition on the basis that it did not state facts which showed a cause of action against the defendants, we stated that under the principles set forth in such decision we doubted that plaintiff could amend its petition to state a cause of action, but that if it felt that such could be done leave was granted to file such amendment. The plaintiff herein has done this by the filing of its "Amendment to Amended Petition" on April 20, 1960. Thereafter defendants filed a general demurrer to such pleading, briefs in support and in opposition to such demurrer have been filed, and such is now before the court for decision.

The new petition of April 20, 1960, is identical to that previously considered in our decision of February 4, 1960, with the exception of the addition of two new sentences.

In paragraph 8, a sentence has been added reading:

\* \* \* "The Censorship Statutes were declared to be unconstitutional on September 10, 1952, by the Municipal Court of Toledo, Ohio, which decision was a matter of notoriety of which defendants were well aware but despite said Municipal Court decision defendants publicly stated that they would continue to charge and collect censorship fees and did in fact continue to charge and collect said fees from plaintiff."

In paragraph 9, a sentence has been added reading:

\* \* \* "Plaintiff made said payments under protest giving those of defendants who were holding said respective offices at the time of such payments notice of the grounds upon which its protest was made and notifying such defendants of its intention to make recovery of such payments."

As noted in our previous decision plaintiff herein seeks personal recovery against the named defendants, and as also noted such is predicated upon the theory of an "implied contract."

The added reference in the petition to the judgment of the

Toledo Municipal Court, in our opinion, does not in any way change our conclusion or our reasoning in the decision of February 4, 1960. In the first place none of the parties defendant were parties, either directly or indirectly, in such case, the action being a criminal action in such court. In the second place, the actual judgment of the court was limited to the conclusion that the defendant therein was not guilty by reason of showing certain news reels, not previously submitted to the Censorship Board, since "the statutes of the State of Ohio on Censorship of Films, as applied to news reels, are definitely unconstitutional." There is no allegation in the petition that the fees sought to be recovered represent censorship fees of news reels, either in whole or in part. In the third place to assert that the defendants, by virtue of the case of *State* v. *Smith*, 63 Ohio Law Abs., 452 (the Toledo Municipal Court decision) therefore must have concluded that they were acting illegally in accepting fees from the plaintiff for movie censorship is to assert that the judges of the Supreme Court of Ohio must necessarily have reached this same conclusion *at such time*. It of course must be noted that five of the seven members of the Supreme Court of Ohio, seven months *later*, concluded in the case of *Superior Films, Inc.* v. *Department of Education of the State of Ohio*, 159 Ohio St., 315, that such statutes were not unconstitutional. Surely an administrative official or officials should not be considered to be more expert in constitutional law or in their ability to ultimately predict decisions of the United States Supreme Court than the judges of our Supreme Court. By the acceptance of the fees in question and by the censorship of films by some of the defendants, in pursuance of legislative mandate, such defendants were merely carrying out the respective duties of their offices as they then understood such duties and had a perfect right to so understand such duties. Because of later decisions to a contrary effect, it is now attempted to hold them personally responsible for moneys which they accepted, did not retain for their personal benefit, and turned in to the State Treasury in accordance with the law. To hold them personally responsible for the return of such money in our opinion would be no more justifiable than an action brought against members of the Supreme Court of Ohio

itself because of their inability on April 29, 1953, in the Superior Films, Inc., case to predict a later decision of the United States Supreme Court. This action too continued for an additional period of over one and one half years the payment of the fees sought to be collected.

The allegation of the new petition in paragraph 9, relative to making payments under protest and notifying the defendants then in office of the intention of the plaintiff to make recovery of such payments apparently is directed to our previous discussion at page 243 of our prior decision and our reference therein to the case of *Elliott* v. *Swartwout*, 9 Law Ed., 133. As to this one specific facet of our prior reasoning the additional language might be considered as making such reasoning inapplicable to the newly Amended Petition. Actually, however, the *Elliott case*, to the extent that it did hold a federal tax agent liable, after protest, notice of intention to sue etc., was limited to a factual situation where the *statutory* law did not authorize the imposition or collection of such tax. Here the *statutory* law required the acceptance of such fees. It might also be noted that as to such fees no duties were directly imposed on any state official to take affirmative steps to collect the same (their duty being merely to accept and account for same), the enforcement being by police action by way of making the showing of a film not submitted and approved an offense. This, of course, is how the *Smith case* arose.

In any event, our previous decision and conclusion was not based simply on the rationale of the *Elliott case*. In essence we concluded then and we again conclude that an action in quasi contract is not stated within the purview of the essential elements of such action as stated in the third paragraph of the syllabus of *Rice* v. *Wheeling Dollar Savings and Trust Co.*, 155 Ohio St., 391, referred to at page 243 of our prior opinion.

In this connection we might add parenthetically that if the defendants then in office must be considered bound in all respects as "final" law the decision in *State* v. *Smith, supra*, it would logically appear that they also should have been bound by the conclusion therein that the fees charged were actually a tax. In such event, of course, Section 2723.01, Revised Code,

would bar the recovery of such fees since this action was not brought within one year after the collection thereof.

In conclusion, we find nothing in the two new sentences added to the petition which would compel or justify any conclusion different than that previously arrived at. The demurrer to the Amendment to Amended Petition, filed April 20, 1960, is sustained for the reason that such does not state facts which show a cause of action against the defendants or any of them. Since plaintiff has previously been given the opportunity to amend after a prior demurrer was sustained, final judgment may be rendered in the favor of the defendants at the costs of the plaintiff. Entry may be prepared accordingly reserving exceptions.